**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE ARBITRAGE FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ACTIVISION BLIZZARD, INC., ROBERT KOTICK, and BRIAN KELLY,<br><br>Defendants. | Case No. 1:26-cv-00489-JLH<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED<br><br>**UNREDACTED/PUBLIC INSPECTION VERSION** |

**CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS


I. NATURE OF THE ACTION .......... 2

II. JURISDICTION AND VENUE .......... 7

III. PARTIES .......... 8

A. Plaintiff .......... 8

B. Defendants .......... 8

1. Activision .......... 8

2. Robert Kotick .......... 9

3. Brian Kelly .......... 10

C. Relevant Non-Parties .......... 10

IV. FACTUAL BACKGROUND .......... 11

A. Defendants Kotick and Kelly Acquire Activision .......... 11

B. Allegations of Sexual Harassment at Activision Emerge .......... 12

C. In a Panic, Defendant Kotick Seeks a Merger with Microsoft .......... 14

D. Defendants Agree to Negotiate in a Price Range Far Below the Board's Internal Implied Price Range .......... 17

E. Defendants Negotiate a Reverse Termination Fee and Cloud Services Agreement With Microsoft .......... 20

F. The Merger Agreement Specified A "Drop Dead" Termination Date for the Transaction .......... 23

G. The Reverse Termination Fee .......... 24

H. Defendants Execute the Company Disclosure Letter .......... 25

I. Activision Secretly Agrees to Purchase Cloud Services from Microsoft That Reduces the Reverse Termination Fee .......... 26

J. The Merger Agreement Limits Dividend Payments to Activision Shareholders .......... 27

K. The Merger Closing is Delayed Given Significant Antitrust Challenges by U.S. and Foreign Regulators .......... 29

L. The Board Declares an Undisclosed 2023 Dividend For the Treasury Stock Held by an Activision Subsidiary .......... 33

M. Defendant Kotick Executes the Letter Agreement Extending the Merger Termination Date and Granting the 2023 Shareholder Dividend for the Amber Treasury Shares ........ 34

N. Defendants Pay the 2023 Dividend on the Amber Treasury Shares Acquired by Microsoft Under the Merger ........ 36

O. The Merger Closes ........ 36

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS ........ 37

A. Defendants Falsely Asserted the Merger Consideration Was Financially Fair ........ 37

B. Defendants Failed to Disclose the Cloud Agreement That Significantly Offset Microsoft's Reverse Termination Fee ........ 38

C. Defendants Concealed Amber Received a $424 Million Dividend that Diverted Value From Public Shareholders for the Benefit of Microsoft ........ 41

VI. ALLEGATIONS OF SCIENTER ........ 42

VII. PRESUMPTION OF RELIANCE ........ 44

VIII. LOSS CAUSATION ........ 45

IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ........ 47

X. CLASS ACTION ALLEGATIONS ........ 48

XI. CLAIMS FOR RELIEF ........ 49

COUNT I For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5(a)-(c) Against All Defendants ........ 49

COUNT II For Violation of §20(a) of the Exchange Act Against Defendants Kotick and Kelly ........ 51

XII. PRAYER FOR RELIEF ........ 53

XIII. JURY DEMAND ........ 53

Plaintiff The Arbitrage Fund ("Plaintiff"), by and through its undersigned counsel, brings this action ("Action") on behalf of a Class (defined below) of investors that sold shares of Activision Blizzard, Inc. ("Activision" or the "Company") common stock from January 18, 2022, the announcement date of the acquisition (the "Merger") of Activision by Microsoft Corporation ("Microsoft") to October 13, 2023 (excluding those that tendered their Activision common stock in the Merger) (the "Class Period"), and were damaged as a result of Defendants' wrongdoing alleged herein (the "Class").

The subject claims are brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5(a)-(c), 17 C.F.R. § 240.10b-5(a)-(c), against (i) Activision, (ii) Robert Kotick ("Kotick"), Activision's former Chief Executive Officer ("CEO") and member of the Activision board of directors (the "Board"), and (iii) Brian Kelly ("Kelly"), Activision's former Chairman of the Board (collectively, "Defendants").

Plaintiff's claims are based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on, among other things, the independent investigation of its undersigned counsel. This investigation included, but was not limited to, a review and analysis of:

(i) Activision's public filings with the SEC;

(ii) Defendants' public statements concerning the Merger made during the Class Period, including the Company's definitive proxy statement on the Merger filed with the SEC pursuant to Section 14(a) of the Exchange Act and distributed to Activision shareholders on March 21, 2022 (the "Proxy");

(iii) Company press releases, reports, and postings concerning the Merger on the websites for Activision and Microsoft;

(iv) Media reports concerning Activision, Microsoft, and the Merger;

(v) Data reflecting the price of Activision's common stock;

(vi) Unredacted filings in the case captioned *Sjunde AP-Fonden v. Activision Blizzard, Inc.*, C.A. No. 2022-1001-KSJM (Del. Ch.), that were obtained pursuant to Delaware Chancery Court Rule 5.1; and

(vii) Additional material and data concerning Activision and the other Defendants.

Plaintiff's investigation is ongoing, and many relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiff believes that substantial additional evidentiary support for the allegations in this complaint (the "Complaint") will exist after reasonable discovery is permitted.

## I. NATURE OF THE ACTION

1. This Action arises from a scheme by Defendants Kotick and Kelly, facilitated by material misstatements and omissions to shareholders, to hastily negotiate Activision's sale to Microsoft (that ultimately closed in October 2023) in order to lock in huge profits on their stock holdings, options, and other incentives, before allegations of widespread workplace harassment and discrimination at the Company threatened their positions at the Company and the Company's ongoing business relationship with Microsoft.

2. Starting in July 2021, allegations of pervasive sexual harassment and discrimination at the Company emerged, resulting in numerous state and federal government investigations and multiple employee protests. In response, Defendants Kotick and Kelly orchestrated a rushed corporate Merger at a price that did not reflect the Board's internal valuation

of the Company in order to guarantee hundreds of millions of dollars in profits from their existing equity in Activision, and to safeguard Kotick's unexercised stock options and incentives that he would forfeit if forced out of the Company due to the workplace harassment issues.

3. The scheme by Defendants Kotick and Kelly was achieved through a series of integrated material misstatements and omissions by Defendants that, among other things, started with the January 2022 announcement of the Merger that failed to disclose certain incentives to Microsoft, continued with the March 2022 Proxy that misrepresented the fairness of the Merger, and concluded with the July 2023 announcement of a shareholder dividend that also involved an undisclosed incentive to Microsoft, as detailed below.

4. *First*, on January 18 and 19, 2022, Activision filed SEC Form 8-K reports announcing the Merger and attaching the Agreement and Plan of Merger (the "Merger Agreement") with Microsoft. Among other things, the January 19 Form 8-K identified "customary termination provisions" in the Merger Agreement, including a $2 to $3 billion reverse termination fee by Microsoft (the "Reverse Termination Fee") designed to putatively protect Activision and its shareholders if the deal was terminated. But the Form 8-K did not disclose a secret and ironically named Company Disclosure Letter (the "CDL") executed on January 18, 2022 that gave Microsoft an inducement in the form of a massive offset to its Reverse Termination Fee.

5. Defendants knew their statements and omissions concerning Microsoft's Reverse Termination Fee were materially false and misleading. They never disclosed the CDL, that the shareholder protection from the Reverse Termination Fee was materially reduced by Activision's corresponding pledge in the CDL to purchase "cloud services" from Microsoft in the event the Reverse Termination Fee became due, or that the undisclosed offset was an incentive to Microsoft to get the deal done fast before any adverse consequences to Defendants Kotick and Kelly from

the allegations of harassment and discrimination. Unbeknownst to shareholders, Activision's agreement to negotiate this "Cloud Agreement" with Microsoft effectively offset Microsoft's Reverse Termination Fee by ***$666 million to $1 billion***—one-third of the $2 to $3 billion termination fee in place at the time of the Proxy and the shareholder vote on April 28, 2022.

6. *Second,* on March 21, 2022, Activision issued the Proxy signed by Defendants Kotick and Kelly, which represented to unaffiliated Activision shareholders that the Merger and the $95 per share in merger consideration (the "Merger Consideration") were "***advisable, fair to and in the best interests***"[1] of such shareholders. However, the Proxy did not reveal that the Merger Agreement:

(i) Was the result of negotiations in a price per share range agreed to at the outset by Defendants Kotick and Kelly that was far lower than an internal per share valuation range calculated and approved by the Board prior to any contemplated acquisition;

(ii) Was negotiated at the lower price range because Defendants Kotick and Kelly sought to quickly reach an agreement with Microsoft to guarantee their massive profits from existing equity holdings while safeguarding Defendant Kotick's unexercised stock options;

(iii) Provided for a Merger price of $95 per share (*i.e.*, the Merger Consideration) that was ***$18 below*** the low-end of the Board's undisclosed per share valuation of the Company; and

(iv) Was materially modified by the undisclosed CDL that reduced shareholder protections by offsetting Microsoft's Reverse Termination Fee in the event the Merger did not timely close.

---

[1] All emphasis herein is added unless otherwise noted.

7. With respect to the purported fairness of the Merger Consideration, Defendants omitted that on November 2, 2021—less than three weeks before Defendant Kotick initiated negotiations with Microsoft—the Board executed a unanimous written consent approving Activision's Long Range Strategic Plan (the "LRP") that identified an implied per share price range of ***$113 to $128*** for Activision common stock, far higher than the $95 per share in Merger Consideration that Defendants agreed upon.

8. *Third*, on July 18, 2023, Activision announced a $0.99 per share dividend to shareholders. But Defendants did not disclose yet another inducement to Microsoft that was part of the scheme to complete the hasty Merger. Defendants agreed to also pay this dividend (the "2023 Dividend") on treasury shares held by a wholly owned Activision subsidiary, Amber Holding Subsidiary Co. ("Amber"), that would inure to the benefit of Microsoft after the Merger, without any additional consideration to public shareholders. Activision had never previously paid a dividend on its treasury shares, nor reported any treasury share dividend payment in its financial statements.

9. This undisclosed treasury share dividend was set forth in an agreement between Activision and Microsoft executed on July 18, 2023 (the "July 2023 Letter Agreement" or "Letter Agreement"). Defendants executed the July 2023 Letter Agreement with Microsoft in order to extend the "drop dead" closing date for the Merger. Microsoft's Reverse Termination Fee became payable to Activision and its shareholders on the original July 18, 2023 "drop dead" date given prolonged regulatory challenges to the Merger. Rather than collect the Reverse Termination Fee (which was actually lower than represented to shareholders) for Activision and its shareholders, Defendants pushed the closing date to October 18, 2023 ***and*** added the undisclosed 2023 Dividend to Amber that would benefit Microsoft. Undisclosed to public shareholders, Amber—and by

extension Microsoft—ultimately received a ***$424 million*** dividend for the 428.6 million Activision treasury shares it held.

10. Defendants' Class Period statements about the 2023 Dividend wholly concealed that Microsoft, as the acquiring company, effectively received a ***$424 million rebate*** which should have been earmarked for public Activision shareholders. Such shareholders were never informed that $424 million in value was diverted to Microsoft without any increase in their dividend or the $95 per share Merger Consideration.

11. In sum, the concealment that (i) Defendants Kotick and Kelly had agreed to a negotiating range and ultimate Merger Consideration that was significantly below the Board's internal valuation in the LRP to hasten the Merger; (ii) the Reverse Termination Fee offered substantially less protection to Activision shareholders than it appeared because of the corresponding undisclosed inducement by Activision to purchase offsetting "cloud services" from Microsoft; and (iii) the 2023 Dividend on the Amber treasury shares benefitted Microsoft post-Merger as a *de facto* rebate, were separately and collectively highly material facts that made the assertion that the Merger was "***advisable, fair to and in the best interests***" of unaffiliated shareholders false and misleading. Defendants knew these objective—yet undisclosed—facts meant the Merger was not "fair" or in the "best interests" of Activision shareholders.

12. All told, the scheme and attendant material misstatements and omissions that facilitated the Merger enabled Defendants Kotick and Kelly to collect an estimated $400 to $500 million and over $130 million, respectively, from their Activision holdings.

13. The scheme by Kotick and Kelly depended on the foregoing material misstatements and omissions that obscured the reality that the Merger and Merger Consideration understated the fair value of Activision and the Company's common stock. Plaintiff and other Class members

were damaged when (i) the Merger set the ceiling for the market price of the common stock (that was lower than the internal valuation range approved by the Board); (ii) shareholders sold their Activision shares into the open market at a discount from the fair value of the stock; and (iii) shareholders that sold their shares before the Merger forfeited state law rights, including their fair value appraisal rights. This Action seeks redress on their behalf.

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5(a)-(c) promulgated thereunder, 17 C.F.R. §240.10b-5(a)-(c). This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

15. Personal jurisdiction exists over each Defendant either because (i) the Defendant conducts business in or maintains operations in this District, or (ii) is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

16. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b). At all relevant times, Activision was incorporated in this District, and many of the acts and conduct that constitute the violations of law complained of herein occurred in this District, including the dissemination of false and misleading statements in and from this District during the Class Period.

17. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiff

18. Plaintiff The Arbitrage Fund is an investment fund advised by its investment advisor Water Island Capital, LLC, a New York-domiciled SEC-registered entity.

19. As set forth in the attached certification, Plaintiff beneficially owned and sold Activision common stock during the Class Period, and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

### B. Defendants

#### 1. Activision

20. Defendant Activision is a Delaware corporation with principal executive offices located at 2701 Olympic Boulevard, Santa Monica, California. Activision is a global developer and publisher of interactive entertainment and content services for video game consoles, personal computers ("PCs") and mobile devices. Activision operates through three business segments with well-known and extremely popular game franchises: (i) Activision Publishing, Inc., which includes titles and content for *Call of Duty*, a first-person video game franchise; (ii) Blizzard Entertainment, Inc., which includes the *Warcraft*, *Diablo* and *Overwatch* video game franchises; and (iii) King Digital Entertainment, plc, which includes the *Candy Crush* video game franchise.

21. As of December 31, 2022, Activision had approximately 13,000 full-time and part-time non-temporary employees throughout North America, the EMEA region (*i.e.*, Europe, the Middle East and Africa), and the Asia Pacific region. Approximately 69% of these employees worked directly on, or supported, Activision's game and technology development.

22. During the Class Period, Activision's common stock was listed and publicly traded on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "ATVI." Activision common stock was delisted after the Merger, but Activision continues to exist as a wholly owned subsidiary of Microsoft. Activision issued the Proxy—signed by Defendants Kotick and Kelly—that contained the materially false and misleading statements and omissions of material fact alleged herein. Activision also filed with the SEC the Forms 8-K, 10-Q and press releases containing additional material misstatements and omissions alleged herein.

**2. Robert Kotick**

23. Defendant Robert Kotick is Activision's founder and was the CEO and Chairman of Activision from 1991 through 2008. Defendant Kotick was President and CEO of Activision from 2008 through 2017, and remained as the Company's CEO until December 29, 2023. He also served as a director of the Company at the time of the Merger.

24. Prior to the Merger closing, Defendant Kotick and his affiliated trusts held 4,296,550 shares of Activision common stock, and Kotick had the right to acquire an additional 2,201,878 shares through the exercise of his vested Activision stock options. Under the terms of his employment agreement with Activision, Kotick would have forfeited any unvested equity and his vested but unexercised stock options had he been terminated "for cause" given the Company's workplace harassment scandal. Through the Merger, Kotick was able to retain his position as CEO of Activision while the deal was pending. This allowed him to retain his lucrative stock options that would have otherwise been forfeited had he been terminated "for cause." Under a "for cause" termination before execution of the Merger Agreement, Kotick would have been entitled to continuing benefits worth only $41,812 plus his Activision common stock holdings.

25. Defendant Kotick reaped enormous personal compensation under the Merger. All told, this included his receipt of an estimated $400 to $500 million from the exchange of his

Activision equity in the Merger, and $14 million in "golden parachute" compensation when he resigned as CEO and Director in December 2023.

26. Defendant Kotick signed the Proxy and July 2023 Letter Agreement as the Company's CEO, both of which contained the material misstatements and omissions detailed below. Defendant Kotick also filed a Certification for Activision's July 31, 2023 10-Q, which likewise contained material misstatements and omissions as set forth herein.

**3. Brian Kelly**

27. Defendant Brian Kelly was an Activision director from 1995 through the close of the Merger, and served as Chairman of the Activision Board from 2013 through Merger close. Kelly was an initial co-investor in Activision with Defendant Kotick. Defendant Kelly and his affiliated trusts held 1,159,167 shares of Activision common stock prior to the Merger closing. He also held 81,478 Activision stock options, including 802 restricted stock units of the Company at Merger closing. Based on these holdings, Defendant Kelly is estimated to have received over $130 million in total compensation under the Merger. Kelly signed the Proxy as Board Chairman.

**C. Relevant Non-Parties**

28. **The Board** or **Board of Directors** consisted of Defendants Kotick and Kelly, along with non-party directors Reveta Bowers, Robert Corti, Hendrik Hartong III, Barry Meyer, Robert Morgado, Peter Nolan, Dawn Ostroff, and Casey Wasserman. The Proxy containing the material misstatements and omissions alleged herein was issued "By Order of the Board of Directors."

29. **Microsoft Corporation** (previously defined as "Microsoft") is a Washington corporation headquartered in Redmond, Washington. Microsoft is a global technology company engaged in a wide range of services and products, including cloud-based computing, artificial intelligence software, computer operating systems, desktop and server management tools, and business solution applications. Microsoft also designs and sells computing devices such as PCs,

tablets, and gaming and entertainment consoles. Microsoft's "More Personal Computing" operating segment includes a "Gaming" division, which is focused on the company's Xbox gaming console and related online gaming content.

30. **Allen & Company LLC** ("Allen & Company") is a privately held investment bank headquartered in New York City that provides advisory services, underwriting, and private-placements for leading companies in the real estate, technology, media and entertainment sectors. Allen & Company served as Activision's financial advisor on the Merger and issued a fairness opinion on the transaction that characterized the $95 per share in Merger Consideration paid to Activision shareholders under the Merger as "fair, from a financial point of view" to such shareholders.

## IV. FACTUAL BACKGROUND

### A. Defendants Kotick and Kelly Acquire Activision

31. In December 1990, Defendants Kotick and Kelly invested in Activision's fledgling predecessor company, Mediagenic. In 1991, Kotick and Kelly orchestrated a hostile takeover of Mediagenic and renamed the company Activision following Defendant Kotick's comprehensive personnel and bankruptcy restructuring of the Company.

32. Activision conducted an initial public offering in 1993, and the Company began trading on the NASDAQ small-cap exchange under the ticker symbol "ATVI."

33. Kotick expanded Activision's business over the course of the following decade through the acquisition of numerous independent video game producers. In 2008, Activision merged with Vivendi Games, the parent company of Blizzard Entertainment, Inc. to form Activision Blizzard, Inc. (previously defined as "Activision"). Defendant Kotick was appointed CEO of Activision following the Vivendi Games merger. By 2011, Activision had become the largest video game publisher in the world with the significant growth of its popular *Call of Duty*

video game franchise.

34. Activision had a longstanding business history with Microsoft. Microsoft's first Xbox gaming console was released in 2001, and Activision designed numerous video games for this first iteration of Xbox, including the *Gun*, *Spider-Man*, and *Tony Hawk* game titles. The relationship grew stronger with the release of Activision's *Call of Duty* video game. The significant commercial success of *Call of Duty* led to additional marketing and business arrangements between Activision and Microsoft, including exclusive downloadable content for Microsoft's Xbox console.

**B. Allegations of Sexual Harassment at Activision Emerge**

35. On July 20, 2021, the California Department of Fair Employment and Housing ("DFEH") filed a civil complaint against Activision seeking injunctive and monetary relief based on the Company's alleged discriminatory practices against women and minority employees. The DFEH complaint was the culmination of over two years of investigation by the agency into sexual harassment and workplace discrimination at the Company.

36. According to the DFEH complaint, later amended in August 2021, the agency's investigation "found evidence that [Activision and certain unnamed employees] discriminated against female employees and contingent or temporary workers in terms and conditions of employment, including compensation, assignment, promotion, termination, constructive discharge, and retaliation." Based on these findings, the DFEH complaint asserted numerous violations of California's Fair Employment and Housing Act and California's Equal Pay Act.

37. On July 23, 2021, Activision Executive Vice President Fran Townsend emailed Company employees and insisted that the DFEH complaint was "meritless" and presented an "untrue picture" of the Company. In turn, Activision issued an official statement denying the allegations in the DFEH complaint and called it "irresponsible behavior from unaccountable State

bureaucrats that [is] driving many of the State's best businesses out of California."

38. Activision employees nonetheless reacted quickly to the allegations in the DFEH complaint and the Company's dismissive response to the workplace harassment claims. On July 26, 2021, more than 2,000 former and current Activision employees signed a petition condemning Activision's response to the lawsuit as "abhorrent and insulting." Two days later Activision employees engaged in a walkout and work stoppage to support the petition against the Company.

39. In reaction to the growing scandal, Defendant Kotick sent an internal email to Activision employees apologizing for the "tone deaf" response to the DFEH complaint and promising "swift action to be the compassionate, caring company you came to work for and to ensure a safe environment" for Company employees.

40. Certain senior Activision executives resigned following the DFEH lawsuit, including the President of Blizzard Entertainment, J. Allen Brack. Jesse Meshuk, head of human resources at Activision, also resigned from the Company on or about August 3, 2021. On August 12, 2021, Activision confirmed that three senior game designers implicated in the Company's workplace harassment issues, Luis Barriga, Jesse McCree, and Jonathan LeCraft, had also departed the Company. Activision ultimately settled with the DFEH in December 2023 for approximately $54.8 million.

41. Additional government agencies soon began investigating the alleged workplace harassment issues at Activision. On August 12, 2021, it was reported that Activision employees had received an email from the U.S. Equal Employment Opportunity Commission ("EEOC") asking them to complete a survey about their work experience in connection with the EEOC's investigation of alleged sexual harassment at the Company.

42. Following its investigation, the EEOC filed a complaint against Activision on

September 27, 2021 alleging violations of Title VII of the Civil Rights Act of 1964. In March 2022, Activision and the EEOC filed a consent decree to settle the agency's charges for $18 million to compensate employees subjected to harassment and discrimination in the workplace. The Company also implemented mandatory sexual harassment training and other remedial workplace measures as part of the EEOC settlement.

43. On September 20, 2021, *The Wall Street Journal* reported that the SEC had opened an investigation into Activision's "disclosures regarding employment matters and related issues." Activision confirmed that the SEC had issued document subpoenas to the Company and several current and former employees, including Defendant Kotick. In February 2023, Activision agreed to pay an SEC fine of $35 million for failing to maintain adequate disclosure controls concerning workplace misconduct complaints by Company employees, among other SEC rule violations.

44. Further damaging disclosures about workplace harassment and employment discrimination at Activision emerged in November 2021. On November 16, 2021, *The Wall Street Journal* published an article titled "Activision CEO Bobby Kotick Knew for Years About Sexual-Misconduct Allegations at Videogame Giant." The article reported that Defendant Kotick was long-aware of these issues at the Company, yet made no significant changes in Activision's employment and workplace practices in response.

45. These investigations and lawsuits by government agencies, as well as the growing negative media coverage of Activision's workplace environment, put the spotlight on Defendant Kotick.

### C. In a Panic, Defendant Kotick Seeks a Merger with Microsoft

46. Defendants orchestrated the Merger with Microsoft against this backdrop of damaging allegations of sexual harassment and discriminatory workplace practices, the resulting government investigations, and Defendant Kotick's imperiled position as CEO. As Defendant

Kotick was facing calls to resign, Kotick sought to avoid the widening harassment and employment scandal at Activision, and the negative impact it would have on his personal finances, by negotiating a quick Merger with Microsoft in a price range far below its fair value as internally determined by the Board.

47. Following the November 2021 *Wall Street Journal* article, Microsoft's then-Executive Vice President of Gaming, Phil Spencer ("Spencer"), emailed Microsoft employees to inform them that he and other executives in Microsoft's gaming division were "disturbed and deeply troubled by the horrific events and actions" at Activision that were reported in the article. Based on *The Wall Street Journal* reporting, Spencer further stated that Microsoft was reevaluating its entire business relationship with Activision.

48. Activision's employees and shareholders also increased the pressure on Defendant Kotick. On November 16, 2021, Activision employees staged another walkout in response to *The Wall Street Journal* article and demanded Kotick step down as CEO. In a letter sent to the Activision Board on or about November 17, 2021, a group of Activision shareholders holding a total of 4.8 million shares and led by the Strategic Organizing Center Investment Group also called for Kotick to resign. The letter also called for Defendant Kelly and Robert Morgado, Activision's two longest-serving Board members, to retire from the Board by December 31, 2021.

49. Facing this rising tide, Defendant Kotick sought a quick sale of the Company to protect his personal financial fortune and evade the increasingly damaging revelations about the workplace practices at Activision. At a meeting with Company executives on November 19, 2021, Kotick even conceded that he might resign from Activision if there was no quick resolution of the sexual harassment allegations.

50. Kotick faced substantial personal financial risk if he was terminated from his

position "for cause." Under his employment agreement, a termination "for cause" would result in his forfeiture of over two million unexercised Activision stock options. The value of his Activision equity was also at risk given the Company's workplace harassment scandal. Defendant Kotick therefore had an enormous financial incentive to push for a quick merger with Microsoft to protect the value of his equity and ensure his payout was not lost through a "for cause" termination based on his handling of the Company's damaging workplace harassment issues.

51. Defendant Kelly, Defendant Kotick's longtime business partner, had the same incentive as he held over a million shares of Activision common stock and over 80,000 Activision stock options at the time the Merger was being negotiated.

52. Microsoft, Kotick, and Kelly were, therefore, aligned in their desire for a hasty transaction. Microsoft was eager to exploit Activision's growing employment scandals to acquire the Company at a discount. Accordingly, the parties immediately pursued a merger between the companies.

53. On November 19, 2021, only three days after publication of *The Wall Street Journal* article, Defendant Kotick and Spencer of Microsoft Gaming initiated discussions on potential strategic opportunities for an Activision-Microsoft combination. This initial call led to merger negotiations between Defendant Kotick and senior executives at Microsoft. Defendant Kotick informed Defendant Kelly and Robert Morgado of his call with Spencer, after which representatives of Allen & Company were contacted to act as Activision's financial advisor on the Merger.

54. On November 20, 2021, Defendant Kotick spoke with Microsoft's CEO, Satya Nadella ("Nadella"), during which call Nadella indicated Microsoft was interested in a "strategic combination" with Activision. After the call, Kotick immediately reached out to representatives

of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to act as outside legal counsel for Activision in connection with the Merger. Microsoft retained the law firm of Simpson Thacher & Bartlett LLP ("Simpson") as its outside legal counsel and Goldman Sachs & Co. LLC ("Goldman Sachs") as its financial advisor on the transaction.

### D. Defendants Agree to Negotiate in a Price Range Far Below the Board's Internal Implied Price Range

55. Merger negotiations between Activision, Microsoft and their respective legal and financial advisors continued between late November through December 2021. Unbeknownst to Activision shareholders, the price range for Activision common stock used during these negotiations was far lower than the range Company management presented to the Board in late October 2021—before a combination with Microsoft was even contemplated—that resulted in the Board-approved "Long Range Strategic Plan."

56. Prior to the inception of any Merger negotiations, the Board met on October 28, 2021 to discuss Activision's eighty-nine page "Long Range Strategic Plan" (previously defined as the "LRP"), among other topics. The LRP included a range of implied per share values for Activision common stock. The LRP's "Risked Case" had an implied "***value per share of $113***" and its "Flatout Case" implied a "***value per share of $128***." The LRP also recommended a share buyback because Activision's stock price did not reflect its value at the time. On November 2, 2021, the Board executed a unanimous written consent approving the LRP and its per share price range of $113 to $128 for Activision common stock.

57. The LRP was prepared by Activision management in the ordinary course and was untainted by Defendants' motivation to execute a merger with Microsoft given the Company's harmful workplace harassment uproar. The Board was not contemplating or preparing for a merger with Microsoft or any other third party when the LRP was calculated by Company management.

In fact, when the Board met on October 28, 2021 to discuss the LRP, there was no reference to or discussion of a Company merger or sale.

58. The later-issued Proxy confirmed this in a section titled "***Long-Range Plan***" (emphasis in original). Defendants acknowledged in this section of the Proxy that "[a]s part of Activision Blizzard's ordinary course annual financial planning process, ***and not in contemplation of the merger***, the Long-Range Plan for Activision Blizzard's fiscal years 2021 through 2024 was presented by Activision Blizzard's management to the Activision Blizzard Board of Directors on October 28, 2021." ***But Defendants never disclosed in the Proxy or any other Class Period statement that the Company's LRP calculated a per share price range of $113-$128 for Activision's common stock***.

59. On November 26, 2021, Spencer of Microsoft informed Defendants Kotick and Kelly that Microsoft was preliminarily considering an all-cash acquisition proposal to acquire Activision for $80 per share. Rather than conveying this message to the entire Board, Kotick and Kelly informed non-party Board members Robert Corti and Robert Morgado only.

60. The Proxy represented that in response to Spencer's proposal, Kotick, Kelly, Corti, and Morgado "discussed potential ranges at which the full Activision Blizzard Board of Directors may be willing to consider an acquisition proposal taking into consideration, among other factors, Activision Blizzard's historical trading prices, selected research analysts' estimates for Activision Blizzard and relative trading multiples of Activision Blizzard and its peers." This, notwithstanding that the Board had approved the LRP only three weeks earlier, which already estimated per share stock values for Activision.

61. Despite the much higher per share price range of $113 to $128 calculated in the unaffected LRP approved by the full Board only three weeks earlier, Defendants Kotick and Kelly

and non-parties Corti and Morgado unilaterally decided that Activision should negotiate in a discounted price range of $90 to $105 per share. This was to expedite the sale and protect Defendants Kotick and Kelly. The lower per share price range was used by the parties in Merger negotiations thereafter.

62. Their quick decision to use this lower price range was also driven by Kotick's interest in pushing for a rapid transaction agreement to preserve his enormous Activision stock option grants that would have been forfeited under a "for cause" termination given the Company's workplace issues. The discounted price range also reflected their acknowledgment that Microsoft was negotiating from a position of strength given the Company's workplace harassment scandal and Microsoft's threat to reevaluate its future business dealings with Activision as a result.

63. Defendants Kotick and Kelly, who were both members of the Board, had a vested interest in a quick transaction that would net them hundreds of millions of dollars. However, the Board never appointed a special committee; rather, Defendant Kotick, with the participation of Defendant Kelly, handled the negotiations directly.

64. Based on the lower price range agreed upon by only a small subset of the Board (*i.e.*, Defendants Kotick, Kelly and non-parties Corti and Morgado), Kotick informed Spencer on November 28, 2021 that Activision's Board could be willing to consider an offer by Microsoft in the $90 to $105 per share price range. As noted above, this lower per share price range set the parameters for negotiations between Activision and Microsoft going forward.

65. The next day, Spencer informed Kotick and Kelly of his interest in moving quickly on an agreement within Kotick's proposed price range. Microsoft also knew Kotick's proposed $90 to $105 per share price range was lower than Activision's untainted LRP price range. Activision's LRP reflecting the higher, unaffected price range of $113 to $128 per share was shared

with Microsoft and its financial advisors at Goldman Sachs on December 6, 2021.

66. Using this information, Microsoft sent Activision a "non-binding indication of interest" on December 10, 2021 to acquire Activision for $90.00 per share in cash. Microsoft also sent a draft exclusivity agreement that proposed a period of exclusive discussions between the companies through January 15, 2022. Through its legal representatives at Simpson, Microsoft again expressed a desire to move quickly on its December 10 proposal.

67. Between December 15 and 16, 2021, Defendants Kotick and Kelly exchanged acquisition proposals with Spencer and Nadella in the $90.00 to $100.00 per share range, with Microsoft continuing its request for exclusivity in the negotiation process. On December 16, Defendant Kotick informed Nadella that he was authorized to consider a $95.00 per share price with a 30-day exclusivity commitment. Under this proposal, Kotick also required an agreement on certain key merger terms, with a particular focus on a Reverse Termination Fee payable to Activision should an eventual merger agreement be terminated.

68. In response, Nadella agreed on December 16 to increase Microsoft's earlier non-binding indication of interests to $95.00 per share. Nadella also expressed a readiness to discuss whether Microsoft would agree to a Reverse Termination Fee, and the amount of such fee in connection with a merger agreement between the companies.

### E. Defendants Negotiate a Reverse Termination Fee and Cloud Services Agreement With Microsoft

69. The parties' outside counsel at Skadden and Simpson had multiple calls between December 17 and December 20, 2021, which focused on the parameters of a Reverse Termination Fee by Microsoft among other key terms of the eventual Merger Agreement. On December 20, Defendants Kotick and Kelly had telephone calls with Spencer of Microsoft to discuss the exclusivity agreement and Merger term sheet that was being negotiated, including the Reverse

Termination Fee amount.

70. Later on December 20, an exclusivity agreement was executed between Activision and Microsoft that remained in effect until January 17, 2022. The exclusivity agreement included a "**STRICTLY CONFIDENTIAL**" Merger term sheet that specified the amount and payment conditions for a Reverse Termination Fee to Activision in the event the Merger Agreement was terminated due to antitrust issues (emphasis in original).

71. Notably, a section of the term sheet titled "Antitrust Termination Fee" included a provision under which Activision would negotiate an agreement with Microsoft to "make Microsoft their preferred cloud provider if [Microsoft's] reverse termination fee is paid." This term sheet provision further stated that the "key parameters" of such an agreement would be negotiated during the exclusivity period, including the "Company purchasing cloud services from [Microsoft] in an amount equal to one-third of the [reverse] termination fee over a seven-year term." As detailed below, this provision in the term sheet was later included in the Company Disclosure Letter (previously defined as the "CDL") executed between the parties. ***None of the provisions in the term sheet or CDL were disclosed to unaffiliated Activision shareholders***.

72. The Activision Board, including Defendants Kotick and Kelly, met on December 21, 2021 and received a summary presentation of the Microsoft exclusivity agreement from Skadden representatives. According to the meeting minutes, the Board discussed the Microsoft Reverse Termination Fee and the "Company's current cloud services arrangement," reflecting the significance of the "cloud services" provision in the Merger term sheet.

73. On December 29, 2021, Simpson representatives sent an initial draft of the Merger Agreement to the representatives of Skadden. The draft Merger Agreement provided for an outside termination date of 12 months from signing, subject to two automatic extensions of three months

each that were tied to the satisfaction of certain Merger closing conditions, including antitrust regulatory approvals. The draft also included a Reverse Termination Fee provision that would be payable by Microsoft to Activision in the amount of $2 to $3 billion depending on the timing of such termination.

74. Activision, Microsoft, and their respective representatives continued Merger negotiations throughout the first two weeks of January 2022. A core issue considered by the Activision Board during these negotiations was the cloud services agreement with Microsoft that would become effective if the ultimate merger agreement between the parties was terminated due to delays in regulatory approval.

75. The Board held a meeting on January 14, 2022, during which the cloud services agreement was discussed and identified as a "***key issue[]***" in the Merger negotiations. As reflected in the meeting minutes, Defendant Kotick provided the Board with an update on the status of the Merger, including:

> certain ***key issues under negotiation*** in connection with the merger agreement, such as the principles under which the Company would be operated between signing and closing of the proposed transaction, including the payment of dividends, and a commitment to negotiate in good faith ***a cloud services agreement with [Microsoft] to be effective upon payment of a reverse termination fee by [Microsoft]***.

The details of Activision's cloud services commitment were later memorialized in the undisclosed CDL executed between Activision and Microsoft when the Merger Agreement was signed.

76. Additionally, as stated in the January 14 minutes and detailed further below, Defendant Kotick acknowledged that the payment of shareholder dividends between Merger signing and closing was a "***key issue[]***" under the Merger. *See infra* Section IV.J. At the meeting, Representatives of Allen & Company and Skadden each concurred with Defendant Kotick's

assessment that the cloud services agreement and the payment of shareholder dividends were "material issues" in the Merger negotiations.

77. On January 17, 2022, the Board held a meeting with members of senior management, Allen & Company representatives, and representatives of Skadden to discuss the Merger Agreement terms. At the conclusion of this meeting, the Board unanimously decided to approve the Merger and Merger Agreement and directed that the Merger Agreement be submitted to Activision stockholders for a vote.

78. Following the Board's approval, Activision and Microsoft finalized the Merger Agreement. On January 18, 2022, Activision and Microsoft executed the Merger Agreement and issued a joint press release announcing the transaction. Activision filed a Form 8-K with the SEC the following day that attached a copy of the Merger Agreement but ***did not disclose the CDL containing Activision's cloud services commitment***.

**F. The Merger Agreement Specified A "Drop Dead" Termination Date for the Transaction**

79. The Merger Agreement specified termination rights for Activision and Microsoft that accounted for the extensive regulatory approval process the parties expected for the transaction.

80. Section 8.1(c) of the Merger Agreement allowed both Activision and Microsoft to terminate the Agreement if certain outside closing dates were not met. This provision gave the parties the right to terminate the Merger Agreement if the Merger closing had "not occurred by 11:59 p.m., Pacific time, on January 18, 2023 (such time and date, the '**Initial Termination Date**')" (emphasis in original).

81. The Merger Agreement further specified that this termination date was subject to two automatic extensions when all closing conditions, other than regulatory approvals, had been

satisfied. Specifically, Section 8.1(c) of the Merger Agreement provided that:

> (i) if as of the Initial Termination Date all conditions to this Agreement are satisfied . . . , other than the [antitrust regulatory approval] conditions set forth in [the Merger Agreement] . . . , then the Termination Date shall automatically be extended to 11:59 p.m., Pacific time, on April 18, 2023, and (ii) if as of 11:59 p.m., Pacific time, on April 18, 2023, all conditions to this Agreement are satisfied . . . other than the [antitrust regulatory approval] conditions set forth in [the Merger Agreement]. . . , then the Termination Date shall automatically be extended to 11:59 p.m., Pacific time, on ***July 18, 2023***. . . .

82. Accordingly, the Merger Agreement provided a "drop dead" termination date of July 18, 2023 to allow sufficient time for all antitrust regulatory approvals to be obtained. The termination dates set forth in the Merger Agreement also impacted the amount of Microsoft's Reverse Termination Fee.

**G. The Reverse Termination Fee**

83. The Reverse Termination Fee payable by Microsoft was a fundamental component of the Merger and was detailed in the Merger Agreement executed by the parties. Microsoft's obligation to pay the termination fee depended on satisfaction of the closing conditions specified in the Merger Agreement. One such closing condition was the parties' receipt of antitrust regulatory approvals from the U.S. Federal Trade Commission ("FTC") and analogous antitrust agencies in the other countries where Activision conducted business.

84. Section 8.3(c) of the Merger Agreement, titled "*Parent Termination Fee* (emphasis in original)," required Microsoft to pay Activision the Reverse Termination Fee if the Merger Agreement was terminated for the following reasons:

- A permanent injunction or other order arising from U.S. or foreign antitrust laws prevented consummation of the Merger;
- The enactment of any statute, rule, regulation or order under U.S. or foreign law that "prohibits, makes illegal or enjoins the consummation" of the Merger; and/or

- The Merger had not been consummated by the Initial Termination Date, as may be extended under Section 8.1(c) of the Merger Agreement, and all other Merger conditions were satisfied other than the antitrust regulatory conditions set forth in the Merger Agreement.

Accordingly, Microsoft's ability to avoid the Reverse Termination Fee depended on the absence of any U.S. or foreign antitrust impediments to Merger closing by the termination dates set forth in the Merger Agreement.

85. The amount of Microsoft's Reverse Termination Fee was also tied to the January, April and July 2023 termination dates set forth in the Merger Agreement. If the Merger Agreement was terminated for any of the foregoing reasons, Microsoft was required to pay Activision the following:

- $2 billion if a Merger termination notice is provided prior to the January 18, 2023 termination date;
- $2.5 billion if a Merger termination notice is provided after the January 18 termination date, but prior to the extended termination date of April 18, 2023; or
- $3 billion if a Merger termination notice is provided after the extended termination date of April 18, 2023.

86. Under the Merger Agreement, Microsoft was therefore required to pay Activision a Reverse Termination Fee ranging from $2 to $3 billion if the Merger closing was barred or delayed by U.S. or foreign antitrust laws or regulatory review. Such termination fee was a material component of the Merger and became a significant element of the transaction because the Merger close was substantially delayed by antitrust regulatory review in the U.S., U.K., and European Union.

**H. Defendants Execute the Company Disclosure Letter**

87. Together with the Merger Agreement, Activision also executed the CDL with Microsoft on January 18, 2022. The CDL contained covenants by Activision that expanded the Company's obligations under the Merger Agreement, including giving Microsoft a secret offset in

the event the Reverse Termination Fee was paid. As noted above, as first set forth in the initial Merger term sheet and detailed further below, Activision covenanted in the undisclosed CDL an agreement to execute a "**Cloud Agreement**" (emphasis in original) with Microsoft, under which Activision would purchase between ***$666 million and $1 billion*** in cloud services from Microsoft in the event the Reverse Termination Fee was paid.

88. The Merger Agreement also made Activision's satisfaction of all transaction covenants, including the undisclosed CDL covenant to purchase cloud services from Microsoft, a core condition for Microsoft to close the Merger. Specifically, Section 7.2(b) of the Merger Agreement stated that Microsoft's obligation to close the Merger was expressly conditioned on Activision performing ***all*** Merger covenants, including those modified or augmented by the CDL.

89. In this regard, Section 7.2 stated that Microsoft's obligation "to consummate the Merger will be subject to the satisfaction or waiver . . . prior to the Effective Time of each of the following conditions," including that Activision "will have ***performed and complied in all material respects with all covenants*** and obligations of this Agreement required to be performed and complied with by it at or prior to the Closing."

90. Despite the fact that the CDL was an integral part of the Merger and Merger Agreement, it was neither attached to nor detailed in the Proxy or any other public filings by Defendants.

### I. Activision Secretly Agrees to Purchase Cloud Services from Microsoft That Reduces the Reverse Termination Fee

91. Unbeknownst to Activision shareholders, the concealed CDL substantially offset the Reverse Termination Fee Microsoft would ultimately be required to pay as the Merger closing was delayed past the July 18, 2023 "drop dead" termination date given prolonged regulatory review.

92. Specifically, Section 6.15 of the CDL contained covenants that imposed additional obligations on Activision in the event the Merger Agreement was terminated for failure to close by the July 18 termination date. Under Section 6.15 of the CDL, Activision covenanted to enter into a "**Cloud Agreement**" to purchase cloud services from Microsoft if Microsoft was required to pay its Reverse Termination Fee (emphasis in original).

93. The substantial, yet undisclosed, "**Cloud Agreement**" covenant under the CDL offset ***over one-third*** (*i.e.*, $666 million to $1 billion) of the $2-$3 billion Reverse Termination Fee Microsoft was subject to at the time of the Proxy and the shareholder vote on April 28, 2022. Activision's cloud services covenant represented a $1 billion reduction of the $3 billion Reverse Termination Fee the Company was entitled to collect after the Merger failed to close by July 18, 2023. *See infra* Section IV.K.

94. As noted above, neither the Proxy nor the Merger Agreement detailed any of the CDL provisions. Nor did Defendants ever provide a copy of the actual CDL to Activision shareholders. Accordingly, Activision shareholders were entirely unaware that as part of the Merger, Defendants agreed to buy ***at least $666 million*** in cloud services from Microsoft in the event the Merger Agreement was terminated by July 18, 2023 due to regulatory prohibitions or delays. This CDL covenant effectively diminished the financial protection of Microsoft's Reverse Termination Fee that was not disclosed to shareholders before they voted to approve the Merger.

**J. The Merger Agreement Limits Dividend Payments to Activision Shareholders**

95. In addition to the CDL's cloud services provision that diminished the Reverse Termination Fee, the Merger Agreement also curtailed the payment of annual dividends to Activision's shareholders. Since 2010, Activision had routinely paid an annual dividend to its holders of common stock. Starting in 2010, the Company would declare and pay one regular cash dividend each year, which was typically announced in February and paid in May. Activision did

not pay dividends on its treasury stock, nor did it report any treasury stock dividend in its financial statements.

96. As noted above, and reflected in the Board's January 14, 2022 meeting minutes, the shareholder dividend Activision would pay in the period between Merger signing and Merger close was a "***key issue[] under negotiation***" that impacted the Merger's value for Activision stockholders.

97. The Merger Agreement expressly limited Activision's ability to declare a shareholder dividend during the post-signing, pre-closing period. Specifically, Section 5.2(e) of the Merger Agreement, titled "*Forbearance Covenants* (emphasis in original)," allowed for the payment of only one cash dividend of $0.47 per share between execution of the Merger Agreement and Merger closing or termination, provided Microsoft approved, as follows:

> the Company will not, and will not permit any of its Subsidiaries . . . to . . . declare, set aside, authorize, establish a record date for or pay any dividend or other distribution . . . except for . . . one regular cash dividend on ***Company Common Stock in an amount per share of Company Common Stock not in excess of $0.47***. . .

98. As detailed below, the Merger did not close in 2022 given protracted antitrust regulatory challenges in the U.S., U.K., and European Union. Given this, and absent a modification to Section 5.2(e), Activision shareholders were limited to only one $0.47 per share dividend for 2022 and possibly 2023 depending on the timing and outcome of the regulatory approvals required to close the Merger.

99. Consistent with its prior practice, Activision paid its common stockholders the $0.47 per share dividend on May 6, 2022. The payment of any 2023 shareholder dividend was unresolved given the dividend forbearance provision in Section 5.2(e) of the Merger Agreement.

### K. The Merger Closing is Delayed Given Significant Antitrust Challenges by U.S. and Foreign Regulators

100. Defendants filed the Proxy with the SEC on March 21, 2022, soliciting votes in favor of the Merger and distributed it to Activision shareholders that same day. The Proxy was signed by Defendants Kotick and Kelly and was issued "[b]y Order of the [Activision] Board of Directors." The Proxy set April 28, 2022 as the "special meeting" date for Activision shareholders to vote on the Merger. Shareholders approved the Merger and Merger Agreement on that date.

101. Despite the April 2022 shareholder vote, the Proxy stated that the parties did not expect the Merger to close until "Microsoft's fiscal year ending June 30, 2023." This was less than three weeks before the "drop dead" closing date of July 18, 2023 set forth in the Merger Agreement. The timeline reflected an acknowledgment by Defendants that the Merger would be subject to lengthy regulatory approvals from U.S. and foreign regulatory agencies that could give rise to a Reverse Termination Fee payment to Activision.

102. The necessity of these regulatory approvals ultimately prevented the Merger from closing on the original July 18, 2023 "drop dead" termination date. This gave Defendants the right to collect the $3 billion Reverse Termination Fee from Microsoft (offset by the undisclosed $1 billion cloud services covenant in the CDL)—a right Defendants waived by extending the July 18 termination date without receipt of a higher Merger Consideration for unaffiliated shareholders.

103. As Defendants expected, the Merger elicited significant antitrust scrutiny in the U.S. and abroad from the moment it was announced in January 2022. Under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act"), both Activision and Microsoft were required to file a notice of the Merger with the FTC and the Antitrust Division of the U.S. Department of Justice ("DOJ"). Such notice triggered the statutory 30-day waiting period under the HSR Act before the Merger could proceed. This waiting period is designed to allow antitrust

review of proposed mergers by the FTC and DOJ.

104. On February 1, 2022, the FTC confirmed it would review the proposed Merger over concerns the transaction might lessen competition in the video game industry. That the FTC was leading the investigation rather than the DOJ was seen as significant given the FTC Chair's more aggressive stance on large technology mergers at the time.

105. On March 3, 2022, both Activision and Microsoft received a request from the FTC for additional information and documents concerning the proposed Merger, commonly referred to as a "Second Request." The FTC's Second Request extended the HSR waiting period until 30 days after substantial compliance with the FTC's document and information requests by both Activision and Microsoft.

106. The Merger faced similar antitrust scrutiny in the U.K. and European Union. On September 1, 2022, the U.K.'s Competition and Markets Authority ("CMA") announced it was referring the Merger for a "Phase 2" investigation given its initial finding of potential competition concerns in the cloud gaming market arising from the proposed combination. The CMA initially set a deadline of March 1, 2023 to complete its investigation—a full six-month review.

107. Similarly, on November 7, 2022, the European Commission ("EC") announced it was opening an "in-depth investigation" of the Merger given its concern that the "proposed acquisition may reduce competition in the markets for the distribution of console and personal computer[] ('PCs') video games and for PC operating systems." The EC noted that its preliminary investigation showed the transaction "may significantly reduce competition on the markets for . . . cloud game streaming services," among other antitrust concerns. The EC further announced that it would make no determination on the Merger until March 23, 2023.

108. The FTC's review of the transaction continued in parallel, and ultimately

culminated in a formal complaint to enjoin the Merger. On December 8, 2022, the FTC filed its complaint alleging the Merger violated certain provisions of both the Clayton Antitrust Act and FTC Act. The requested relief ranged from an injunction of the Merger to a divestiture of certain assets in order to address any antitrust violations. The FTC complaint noticed a hearing date for August 2, 2023—weeks ***after*** the July 18, 2023 "drop dead" Merger closing date. Following Activision's answer to the FTC complaint, the parties engaged in extensive discovery over the course of the next several months.

109. Meanwhile, the investigations by the EC and CMA continued. On January 31, 2023, the EC issued a formal "Statement of Objections" to Microsoft concerning the proposed transaction. Among other concerns, the EC noted the risk that Microsoft could gain an anticompetitive advantage in the growing cloud gaming market through the Merger.

110. In response, Microsoft proposed certain licensing concessions to address the EC's cloud gaming concerns. Activision supported Microsoft's proposed licensing arrangement, and Defendant Kotick assured Company employees that he looked forward to a "constructive discussion" with the EC "as we work towards deal close." On May 15, 2023, the EC ultimately determined that Microsoft's proposed concessions were sufficient to address its regulatory concerns. The EC formally approved the Merger in light of Microsoft's proposed adjustments to the transaction.

111. In contrast, on April 26, 2023, the U.K.'s CMA issued the final report on its "Phase 2" investigation, which concluded that the Merger should be blocked given its purported anticompetitive effects. The CMA rejected a similar set of concessions by Microsoft to those it offered to the EC, finding they did not adequately cover different cloud gaming business models such as multigame subscription services.

112. Microsoft immediately announced that it would appeal the CMA's decision. Activision also disputed the CMA's findings in an April 26 press release announcing its robust first quarter 2023 financial results. The CMA issued an interim order blocking the Merger on May 5, 2023 (the "CMA Interim Order"). On May 24, 2023, Microsoft filed an appeal with the U.K. Competition Appeal Tribunal ("CAT").

113. While Microsoft's appeal was pending, the companies continued to litigate the FTC case in the U.S. The FTC was concerned that Microsoft and Activision would close the Merger by the July 18, 2023 termination date given the EC's earlier approval of the transaction. Accordingly, on June 12, 2023, the FTC filed a request for a temporary restraining order and preliminary injunction of the Merger in the U.S. District Court for the Northern District of California.

114. On July 10, 2023, Judge Jacqueline Scott Corley of the Northern District of California denied the FTC's motion for a preliminary injunction. Judge Corley found that the FTC had not demonstrated a "substantial likelihood of success" on its administrative complaint challenging the Merger on antitrust grounds. On July 12, 2023, the FTC appealed Judge Corley's ruling to the U.S. Court of Appeals for the Ninth Circuit, but was denied an emergency motion to block the Merger pending resolution of the appeal.

115. The FTC temporarily withdrew its administrative complaint on July 20, 2023. Yet, the CMA Interim Order was still in place and Microsoft's appeal to the CAT was still pending. As a result, the July 18 "drop dead" termination date had expired at this point in time. Activision could have walked away from the transaction and collected its Reverse Termination Fee from Microsoft. Rather than do so, the Activision Board met to discuss an extension of the termination date and the payment of a 2023 shareholder dividend.

### L. The Board Declares an Undisclosed 2023 Dividend For the Treasury Stock Held by an Activision Subsidiary

116. The Board met on July 17, 2023 to discuss an extension of the termination date, among other Merger-related issues. Representatives of Allen & Company and Activision's outside counsel at Skadden were also present. The Board decided to award a 2023 shareholder dividend at the meeting. Specifically, the Board resolved to pay a dividend for fiscal year 2023 "in an amount per share of [Activision] Common Stock not in excess of ***$0.99***, prior to and not contingent on the [Merger] Closing."

117. The undisclosed Board resolutions approving this dividend notably included the Activision common stock held by Amber Holding Subsidiary Co. (previously defined as "Amber"), a wholly owned subsidiary of Activision. In this regard, the July 17, 2023 Board resolutions provided as follows:

> the Board hereby determines that it is in the best interests of the Company and its stockholders to authorize a distribution in the form of the Cash Dividend [*i.e.*, $0.99/share of common stock] on each of the issued and outstanding shares of Common Stock payable to the holders of Common Stock (which, ***for the sake of clarity, includes the shares of Common Stock currently held by Amber Holding Subsidiary Co., a wholly owned subsidiary of the Company***) . . .

118. The Board, including Defendants Kotick and Kelly, therefore knew they had approved the funding and payment of a 2023 cash dividend on Activision treasury shares held by a wholly owned subsidiary of the Company.

119. Amber held 428,676,471 shares of Activision common stock at the time of the Board resolutions. Because Amber was a wholly owned subsidiary of Activision, the 428.6 million shares held by Amber were classified by the Company as Activision "treasury shares."

120. The Board further resolved at its July 17 meeting to approve and adopt the July 2023 Letter Agreement that extended the Merger termination date and declared the 2023

shareholder dividend for Amber's treasury stock. The July 17 Board Resolutions stated that the July 2023 Letter Agreement and its significant modification of the Merger Agreement was "advisable, fair to and in the best interests of the Company and its stockholders."

### M. Defendant Kotick Executes the Letter Agreement Extending the Merger Termination Date and Granting the 2023 Shareholder Dividend for the Amber Treasury Shares

121. On July 18, 2023, Defendant Kotick and Microsoft's CEO, Nadella, executed the July 2023 Letter Agreement that, among other things, (i) extended the "drop dead" termination date for the Merger by three months, (ii) waived Activision's right to collect the $3 billion Reverse Termination Fee from Microsoft for failure to close by the July 18 "drop dead" termination date, and (iii) provided for the payment of the $0.99 per share dividend.

122. Activision attached a copy of the Letter Agreement to its SEC Form 8-K filed on July 19, 2023. Section 2(a) of the Letter Agreement expressly extended the outside termination date from July 18, 2023 to October 18, 2023, as follows:

> Each of [Microsoft] and [Activision] hereby unconditionally and irrevocably waives any right to terminate the Merger Agreement pursuant to Section 8.1(c) of the Merger Agreement prior to 11:59 p.m. (Pacific time) on October 18, 2023 (the 'Waiver Period') . . .

Through this change, Defendants negotiated away Activision's right to collect the $3 billion Reverse Termination Fee after July 18 (offset by the CDL's cloud services provision), which it otherwise could have done given the pending U.K. antitrust proceedings that prevented the Merger from closing.

123. Activision's waiver of this right was made express in Section 2(g) of the Letter Agreement, which provided that:

> [Activision] hereby unconditionally and irrevocably waives any right to the Parent Termination Fee during the Waiver Period [*i.e.*, from July 18, 2023 to October 18, 2023] . . .

124. The Merger Agreement defined the "Parent Termination Fee" as the Reverse Termination Fee ranging from $2 to $3 billion payable by Microsoft to Activision if the Merger did not close between January 18, 2023 and July 18, 2023 due to antitrust review or prohibition in the U.S. or abroad. *See supra* Section IV.G.

125. The Letter Agreement also narrowed the circumstances under which the Merger Agreement could be terminated. Termination was now only possible if the Merger was not consummated by the extended October 18, 2023 termination date due to pending regulatory approvals (assuming no material breach of any other Merger Agreement provision), or when Activision and Microsoft mutually agreed to terminate. The Reverse Termination Fee was increased to $4.5 billion if the Merger did not close by October 18, 2023.

126. Section 2(c) of the Letter Agreement also eliminated the need for the parties to obtain Merger approval from the FTC or foreign government regulators, other than U.K. regulatory approval. As noted above, Merger approval in the U.K. was still pending given the CMA Interim Order. In sum, the July 2023 Letter Agreement gave up Activision's right to collect the $3 billion Reverse Termination Fee (offset by the CDL's cloud services provision) as of July 18, 2023.

127. Additionally, the July 2023 Letter Agreement waived the dividend forbearance covenant in the Merger Agreement, and awarded the $0.99 per share dividend to Activision shareholders.

128. Neither the Form 8-K announcing the July 2023 Letter Agreement, nor the attached Letter Agreement disclosed the material fact that this 2023 Dividend was also being paid on the treasury stock held by Activision's wholly owned subsidiary, Amber, pursuant to the undisclosed July 17, 2023 Board resolutions.

129. As detailed below, the concealed 2023 Dividend paid to Amber had a material and

negative impact on the stated fairness of the Merger for unaffiliated Activision shareholders.

### N. Defendants Pay the 2023 Dividend on the Amber Treasury Shares Acquired by Microsoft Under the Merger

130. On August 17, 2023, Activision paid the $0.99 per share dividend to unaffiliated shareholders that held outstanding common stock. Specifically, Activision paid unaffiliated shareholders $778.9 million in 2023 Dividends on the 786,798,320 shares of common stock outstanding as of July 24, 2023. Defendants also secretly paid Activision's wholly owned subsidiary, Amber, a 2023 Dividend of $424,389,706 on the 428,676,471 Activision shares that Amber held in treasury for the Company.

131. Activision filed its Form 8-K on October 13, 2023 announcing the Merger closing. At Merger close, Microsoft acquired ownership of Amber's treasury shares, ***thereby effectively receiving the $424 million*** dividend paid on these treasury shares. Unaffiliated Activision shareholders were never informed that Microsoft received $424 million in additional compensation under the Merger through the dividend paid on Amber's treasury shares.

### O. The Merger Closes

132. The closing of the Merger on October 13, 2023 was within the extended "drop dead" termination date set forth in the July 2023 Letter Agreement. The U.K.'s CMA also finally approved the Merger that same day, after Microsoft made certain concessions to address the CMA's antitrust concerns. Given the extensive regulatory review detailed above, the closing occurred almost 18 months after unaffiliated Activision shareholders voted to approve the transaction on April 28, 2022.

133. At Merger closing, each share of Activision common stock (other than the Amber treasury shares and shares held by Microsoft) the holder of which did not dissent and seek a fair value appraisal of their shares was cancelled and converted into the right to receive $95 in Merger

Consideration. Defendants Kotick and Kelly, as well as non-party Board members Bowers, Carr, Corti, Meyer, Morgado, Nolan, and Ostroff, resigned from the Activision Board at Merger close. Activision is now a wholly owned subsidiary of Microsoft.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

134. Throughout the Class Period, Defendants issued, or caused to be issued public statements, including in the Proxy, which were materially false or misleading and omitted material facts as detailed below in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5(a)-(c) promulgated thereunder.

### A. Defendants Falsely Asserted the Merger Consideration Was Financially Fair

135. In recommending shareholder approval of the Merger, Defendants falsely stated in the Proxy that the Merger Agreement terms, including the $95 per share in Merger Consideration, were "***advisable, fair to and in the best interests***" of unaffiliated Activision shareholders.

136. In a section of the Proxy titled "***Reasons for the Merger***" (emphasis in original), the Board, including Defendants Kotick and Kelly, identified "Fair Value" and the opinion of Activision's financial advisor as factors that served as bases for their Merger fairness assertion and recommended approval of the transaction, as follows:

- "*Fair Value*. The belief of the Activision Blizzard Board of Directors that the ***merger represents fair value for the shares of Activision Blizzard common stock***, taking into account . . .[Activision's] potential long-term value"; and

- "*Opinion of Activision Blizzard's Financial Advisor*. The opinion, dated January 17, 2022, of Allen & Company to the [Board] as to the fairness, from a financial point of view," of the Merger Consideration. The Allen & Company fairness opinion attached to the Proxy asserted that the "Merger Consideration to be received by holders of Activision Blizzard Common Stock . . . ***is fair, from a financial point of view,*** to such holders."

137. Defendants knew each of these statements was materially false and misleading

because Activision management and the Board had determined in October 2021—just a month before negotiations started—that Activision stock was valued at $113 to $128 per share of Activision common stock under the Company's undisclosed LRP. This range was far higher than the $95 per share in Merger Consideration that Defendants asserted was fair to unaffiliated stockholders.

138. Moreover, the Proxy did not reveal that Defendants Kotick and Kelly had rushed into negotiations with Microsoft and agreed to a lower per share price range from the outset to protect the value of their equity and stock incentives by facilitating a quick agreement. Nor did Defendants disclose in the Proxy that they further induced Microsoft through their agreement to negotiate the "cloud services" offset to Microsoft's Reverse Termination Fee.

**B. Defendants Failed to Disclose the Cloud Agreement That Significantly Offset Microsoft's Reverse Termination Fee**

139. As noted above, Activision and Microsoft issued a joint press release announcing the Merger on January 18, 2022. The press release praised the Merger and stated the transaction was subject to customary closing conditions and the completion of regulatory review. On January 19, 2022, Activision filed a Form 8-K that purported to summarize key terms of the Merger and attached a copy of the Merger Agreement.

140. The Form 8-K included a purported summary of the Merger Agreement's "customary termination provisions for each of [Microsoft] and [Activision]." In summarizing Microsoft's Reverse Termination Fee, Defendants stated that Microsoft, "under specified circumstances, . . . will be required to pay [Activision] a termination fee" in "an amount equal to $2,000,000,000," "an amount equal to $2,500,000,000," or "an amount equal to $3,000,000,000," depending on whether a termination notice is provided before the first termination date of January

18, 2023, after January 18 but before April 18, 2023, or before the initial "drop dead" termination date of July 18, 2023.

141. The Proxy also specifically identified the protections of Microsoft's "Reverse Termination Fee" as one of the primary bases for the Board's approval and recommendation of the Merger to shareholders, as follows:

> if the merger agreement is terminated in certain circumstances related to the failure to obtain antitrust approvals, Microsoft will be required to pay ***a reverse termination fee of $2,000,000,000*** if the notice regarding termination of the merger agreement is delivered during the first 12 months post-signing, ***$2,500,000,000*** if the notice regarding the termination of the merger agreement is delivered during months 13 to 15 post-signing, or ***$3,000,000,000*** if the notice regarding the termination of the merger agreement is delivered after month 15 post-signing.

142. Throughout the Proxy, Defendants also repeatedly referenced Microsoft's Reverse Termination Fee as a material term of the Merger and Merger Agreement. For example, the Proxy's summary of key Merger terms included a section titled "**Reverse Termination Fee**" (emphasis in original), stating that "Microsoft will be required to pay Activision Blizzard a reverse termination fee ***in an amount ranging from $2,000,000,000 to $3,000,000,000*** if the merger agreement is terminated in specified circumstances." This representation concerning Microsoft's Reverse Termination Fee and the amount owed under it was repeated in several other places in the Proxy.

143. In the "**Background of the Merger**" section of the Proxy, Defendants also purported to describe the parties' negotiation of Microsoft's Reverse Termination Fee, and the amount owed thereunder (emphasis in original). This included the following representation about the Merger term sheet that was executed by the parties on December 20, 2021, together with the

Microsoft exclusivity agreement: "[t]he exclusivity agreement included a term sheet ***specifying the quantum and payment conditions of the reverse termination fee***."

144. Each of the above statements by Defendants in ¶¶ 139-143 was materially false and misleading because they omitted that (i) the undisclosed Merger term sheet and CDL required Activision to negotiate a "**Cloud Agreement**" (emphasis in original) in the event Microsoft had to pay its Reverse Termination Fee; (ii) the agreement would require Activision to purchase cloud services "equal in value to no less than one-third" of Microsoft's Reverse Termination Fee over a seven year period; (iii) Activision's purchase of cloud services would ***equal $666 million to $1 billion***; and (iv) through this undisclosed CDL provision, Defendants effectively agreed to offset ***one-third*** of Microsoft's $2 to $3 billion Reverse Termination Fee in place at the time of the Proxy, the shareholder vote on April 28, 2022, and the initial "drop dead" termination date of July 18, 2023, respectively.

145. Activision's cloud services covenant set forth in the CDL was expressly incorporated into the Merger Agreement and was a material component of the transaction, but was not disclosed to shareholders. As noted above, Defendants also explicitly identified the financial protection of Microsoft's Reverse Termination Fee as a reason for their recommended approval of the Merger to shareholders.

146. Given this, and Defendants' repeated references in the Proxy to Microsoft's Reverse Termination Fee, the amounts purportedly owed under it, and that it was a core basis for the Board's approval of the Merger, Activision shareholders would have considered it material that Defendants agreed to buy between $666 million to $1 billion in cloud services from Microsoft, which fundamentally diminished the shareholder financial protections under the Reverse Termination Fee. Activision shareholders were entirely unaware that Defendants executed a

covenant in the CDL that offset Microsoft's Reverse Termination Fee, and the financial protection it afforded, ***by $666 million to $1 billion***.

### C. Defendants Concealed Amber Received a $424 Million Dividend that Diverted Value From Public Shareholders for the Benefit of Microsoft

147. Defendants made additional misrepresentations during the Class Period concerning Activision's 2023 Dividend and its negative impact on the Merger value for unaffiliated Company shareholders.

148. On July 19, 2023, Defendants filed Activision's Form 8-K with the SEC announcing the execution of the July 2023 Letter Agreement. In addition to reporting that the "drop dead" Merger termination date was extended to October 18, 2023, the 8-K made the following statement about the 2023 Dividend:

> each of [Microsoft] and [Activision] Merger Sub waived the forbearance covenant set forth in the Merger Agreement with respect to the declaration and payment of dividends solely to permit the Company ***to declare and pay one regular cash dividend for fiscal year 2023 on Company Common Stock in an amount per share of Company Common Stock not in excess of $0.99***, prior to and not contingent on the Closing[.]

149. The 8-K also attached a copy of the July 2023 Letter Agreement that made a similar representation about Activision's 2023 Dividend.

150. Defendants filed another Form 8-K on July 19, 2023 that announced Activision's financial results for the fiscal quarter ending on June 30, 2023. With respect to the 2023 Dividend, the 8-K stated that:

> [o]n July 18, 2023, the Company's Board of Directors declared a cash dividend of $0.99 per share of the ***Company's outstanding common stock***, payable on August 17, 2023, to shareholders of record at the close of business on August 2, 2023.

151. The attached press release for Activision's second quarter 2023 financial results repeated the same statement. In describing the July 2023 Letter Agreement, the press release

further stated the Agreement "enables Activision Blizzard to declare and pay one regular cash dividend for fiscal year 2023 of up to $0.99 per share, prior to and not contingent on the closing of the transaction."

152. Activision's Form 10-Q for the Second Quarter of 2023 was filed with the SEC on July 31, 2023 and reiterated Defendants' material misrepresentation about the 2023 Dividend, as follows:

> the Company is permitted to declare and pay one regular cash dividend for fiscal year 2023 in an amount per share not in excess of $0.99, prior to and not contingent on the [Merger] Closing.

153. In a section of the 10-Q titled ***Dividends*** (emphasis in original), Defendants further stated that:

> On July 18, 2023, our Board of Directors declared a cash dividend of $0.99 per share of our ***outstanding common stock***, payable on August 17, 2023, to shareholders of record at the close of business on August 2, 2023.

154. Each of the foregoing statements in ¶¶ 148-153 was materially false and misleading because they failed to disclose that: (i) the Activision Board resolved at its July 17, 2023 meeting to include in the 2023 Dividend the 428.6 million treasury shares held by Activision's wholly owned subsidiary, Amber; (ii) under the July 2023 Letter Agreement, Amber would receive a ***$424 million*** dividend on the treasury shares it held; (iii) Microsoft would effectively receive the $424 million Amber dividend because Microsoft was acquiring Amber and its treasury shares under the Merger; and (iv) the concealed Amber dividend diverted $424 million in value to Microsoft, without any increase in the purchase price or dividends received by unaffiliated shareholders.

## VI. ALLEGATIONS OF SCIENTER

155. Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein. Activision, Kotick, and Kelly acted with scienter in that they knew, or recklessly

disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of Activision during the Class Period and detailed above were materially false and misleading. These Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of those statements as primary violators of the federal securities laws.

156. Defendants participated in the fraud alleged herein by virtue of their negotiations with Microsoft, receipt of information reflecting the true facts regarding Activision and the process leading to the Merger, discussions at Board meetings during which undisclosed information concerning the LRP, CDL, and 2023 Dividend was discussed, their control over, receipt and/or modification of Activision's materially misleading statements and omissions of material fact, and/or their senior positions within the Company, which made them privy to confidential information concerning Activision and the Merger that contradicted Defendants' statements during the Class Period.

157. In their roles as directors and as officers of the Company during the Merger negotiations and Class Period, Defendants Kotick and Kelly directly participated in Board meetings and the management of Activision's operations. Because of their management and director positions at Activision, Kotick and Kelly were involved in the drafting, reviewing, publishing and/or disseminating the materially false and misleading statements and information alleged herein, and possessed the power and authority to control the contents of Activision's SEC filings, including the Company's Class Period Forms 8-K and 10-Q, press releases and the Proxy issued to unaffiliated Activision shareholders in connection with the Merger, which was issued "By Order of the Board of Directors." Defendants Kotick and Kelly also both signed the Proxy,

and Defendant Kotick signed the July 2023 Letter Agreement containing the material misstatements and omissions alleged herein.

158. Activision acted with scienter because the scienter of Kotick and Kelly is imputed to the Company. Both Defendant Kotick and Defendant Kelly spoke on behalf of and controlled the false and misleading Proxy and other Activision SEC filings disseminated to public shareholders concerning the Merger.

## VII. PRESUMPTION OF RELIANCE

159. At all relevant times, the market for Activision common stock was efficient for the following reasons, among others:

a) Activision common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b) According to Activision's last-filed Form 10-Q for the second quarter of 2023, Activision had 786 million shares of common stock outstanding as of July 24, 2023 that were eligible for trading on the NASDAQ;

c) As a regulated issuer, Activision filed periodic public reports with the SEC and was eligible to file SEC Form S-3 registration statements during the Class Period;

d) Activision regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the internet, and other wide-ranging public disclosures;

e) Activision was followed by numerous securities analysts employed by prominent brokerage firms who wrote reports that were distributed to the salesforces and certain customers of their respective brokerage firms. Each of those reports was also publicly available and entered the marketplace;

f) Activision had numerous market makers in its common stock that facilitated trades in such stock during the Class Period; and

g) Unexpected material news about Activision was rapidly reflected in and incorporated into the price for Activision common stock during the Class Period.

160. As a result of the foregoing, the market for Activision common stock promptly digested current information regarding Activision and the Merger from publicly available sources

and reflected such information in the price of Activision common stock. Under these circumstances, all sellers of Activision common stock during the Class Period suffered similar injury through their sales of Activision common stock at artificially discounted prices, and a presumption of reliance applies.

161. A presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based, in primary part, on Defendants' omission of material facts.

## VIII. LOSS CAUSATION

162. During the Class Period, as detailed herein, Defendants made false and misleading statements, engaged in a scheme to deceive the market, and executed a course of conduct that concealed the higher value of Activision and artificially depressed the market price of Activision common stock. Defendants' wrongdoing operated as a fraud or deceit on Class Period sellers of Activision common stock by misrepresenting key components of the Merger and by extension, the actual value of Activision's common stock.

163. By masking material valuation information and fairness defects, Defendants induced public shareholders to divest at the market price that did not reflect the Board's internal valuation rather than preserve and exercise their appraisal rights, thereby depriving them of the opportunity to obtain the fair value of their shares through a statutory appraisal remedy, which would have resulted in a higher recovery.

164. Unaffiliated shareholders that sold their Activision common stock in the open market were entitled to rely on the integrity of the market and the price set by the market as an accurate measure of the stock's value. The market price, however, was artificially depressed due to the false and misleading statements made by the Defendants about the Company and the fairness of the Merger and Merger Consideration. Selling shareholders suffered an economic loss by

selling their shares at deflated prices because (i) the market price at which they sold was less than the price would have been in the absence of the misstatements and omissions, and (ii) they lost the right to seek appraisal to obtain a greater value for their shares.

165. The economic loss suffered by Plaintiff and the Class was proximately caused by Defendants' misconduct. But for Defendants' materially false statements and omissions, Plaintiff and the Class would not have sold their shares or would have preserved and exercised their appraisal rights and obtained higher value in appraisal. Instead, they sold at prices rendered artificially low by Defendants' misrepresentations, thereby forfeiting appraisal and the higher recovery it would have yielded.

166. The Proxy and Defendants' other Class Period statements were essential links in accomplishing the Merger. The economic harm was a foreseeable consequence of Defendants' concealment of material valuation information bearing on the decision whether to sell or preserve appraisal rights, and that concealed risk materialized when Class members sold their shares for less than they would have received absent Defendants' misstatements or in appraisal. Defendants' material misstatements and omissions of material fact caused Plaintiff and the Class to forfeit their right to seek appraisal of the fair value of their Activision common stock under Section 262 of the Delaware General Corporation Law and they were damaged thereby. Alternatively, had Defendants accurately represented the Merger and Activision's true value during the Class Period, Plaintiff and the Class could have sought an injunction of the Merger to negotiate higher merger consideration for shareholders.

167. Plaintiff and the Class also suffered economic loss based upon Defendants' scheme to deceive investors. Defendants' materially false and misleading statements and omissions of material facts operated as a fraud or deceit on Plaintiff and the Class, and induced Plaintiff and the

Class to sell Activision shares at prices that were below the actual value of those securities. Plaintiff and the Class suffered economic harm as a result of their sales of Activision common stock during the Class Period.

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

168. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pled in this Complaint.

169. The statements alleged to be materially false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

170. To the extent the statutory safe harbor applies to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pled because, at the time each of those statements was made, Defendants knew or recklessly disregarded the statement was false, and the statement was authorized and/or approved by Defendants that knew or recklessly disregarded that such statement was false when made.

## X. CLASS ACTION ALLEGATIONS

171. Plaintiff brings this Action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all sellers of Activision common stock from January 18, 2022 through October 13, 2023, excluding those that tendered their Activision common stock in the Merger (previously defined as the "Class"). Excluded from the Class are Defendants, the officers and directors of Activision at all relevant times, members of their immediate families, their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

172. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Activision common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there could be hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Activision or its transfer agent, or the depositary bank for Company common stock. These Class members can be notified of the pendency of this Action by mail, using a form of notice similar to that customarily used in securities class actions.

173. Plaintiff's claims are typical of the claims of the other members of the Class because all members of the Class are similarly affected by Defendants' materially false and misleading statements, omissions of material facts, and improper conduct in violation of the federal laws asserted herein.

174. Plaintiff will fairly and adequately protect the interests of all Class members, and has retained counsel competent and experienced in class and securities litigation.

175. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

a) Whether the Exchange Act was violated by Defendants as alleged herein;

b) Whether statements made by Defendants misrepresented material facts about the Merger as well as the business, operations and prospects of Activision;

c) Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

d) Whether the price of Activision common stock was artificially deflated during the Class Period;

e) Whether Defendants' material misstatements and omissions of material fact caused members of the Class to sustain damages; and

f) The extent of damages sustained by Class members and the proper measure of such damages.

176. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

## XI. CLAIMS FOR RELIEF

### COUNT I
### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5(a)-(c) Against All Defendants

177. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

178. This Count is asserted on behalf of all members of the Class against Activision, Defendant Kotick, and Defendant Kelly for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5(a)-(c) promulgated thereunder, 17 C.F.R. §240.10b-5(a)-(c).

179. During the Class Period, Defendants carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to sell Activision common stock at artificially discounted prices into the open market and forfeit their appraisal rights.

180. Defendants also made untrue statements of material facts and/or omitted material facts necessary to make the statements not misleading in a knowing or reckless effort to maintain artificially low market prices for Activision common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

181. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to disseminate the misleading statements and concealed material information about the Company, its operations and prospects, as well as material information concerning the Merger.

182. During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

183. In his role as CEO of Activision during the Class Period, Defendant Kotick directly participated in the management of Activision's operations and, because of his senior position at

Activision, was involved in the drafting, reviewing, publishing and/or disseminating the materially false and misleading statements and information alleged herein, and possessed the power and authority to control the contents of Activision's Proxy and other Class Period misstatements and omissions in connection with the Merger. The Proxy and the July 2023 Letter Agreement were signed by Defendant Kotick as CEO of Activision, and he signed a Certification of Activision's July 31, 2023 Form 10-Q.

184. Likewise, Defendant Kelly was directly involved in the drafting, reviewing, publishing and/or disseminating of the materially false and misleading statements about the Merger during the Class Period and/or possessed the power and authority to approve and control the contents of Activision's Proxy and other public statements concerning the Merger made during the Class Period. The Proxy was signed by Defendant Kelly as Chairman of the Activision Board.

185. Defendants' omissions and false and misleading statements issued during the Class Period were material in that a reasonable Activision shareholder would view a full and accurate disclosure as significantly altering the total mix of information made available by Defendants and in other information reasonably available to Activision shareholders.

186. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective sales of the Company's securities during the Class Period.

187. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II
## For Violation of §20(a) of the Exchange Act Against Defendants Kotick and Kelly

188. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

189. This Count is asserted on behalf of all members of the Class against Defendant Kotick and Defendant Kelly for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

190. By reason of their high-level positions of control and authority as the Company's most senior officer and Chairman of the Board, participation in, awareness of, direct control of, and/or supervisory involvement in Activision's day-to-day operations during the Class Period, Defendants Kotick and Kelly had the power to, and did, control and influence the decision-making of the Company and the conduct of Activision's business, including the wrongful conduct complained of herein.

191. Defendants Kotick and Kelly were able to and did influence and control, directly and indirectly, the content and dissemination of the statements Plaintiff alleges to be materially false and misleading. Moreover, Defendant Kotick and Defendant Kelly had duties to disseminate accurate and truthful information regarding the Merger and Activision's operations, and to correct any previously issued statements that had become untrue so that the market price of Activision common stock would be based upon truthful and accurate information.

192. Defendants Kotick and Kelly also exercised control over Activision through their involvement in Merger negotiations, presence at Board meetings and authorization of the Proxy and other Company documents containing material misstatements and omissions of material facts during the Class Period.

193. As a direct and proximate result of Defendant Kotick and Defendant Kelly's control of Activision and their wrongful conduct set forth herein, Plaintiff and other members of the Class suffered compensatory damages in connection with their sales of Activision common stock during the Class Period.

194. By virtue of their positions as controlling persons of Activision and as a result of their own aforementioned conduct, Defendants Kotick and Kelly, together and individually, are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a) Declaring this Action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c) Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d) Awarding such other relief as deemed appropriate by the Court.

## XIII. JURY DEMAND

195. Plaintiff demands a trial by jury on all issues so triable.

DATED: May 5, 2026

**SAXENA WHITE P.A.**

/s/ *Thomas Curry*
Thomas Curry (#5877)
824 N. Market Street, Suite 1003
Wilmington, Delaware 19801
Tel.: (302) 485-0483
tcurry@saxenawhite.com

– and –

David J. Schwartz (*pro hac vice* forthcoming)
Marco Dueñas (*pro hac vice* forthcoming)
10 Bank Street, Suite 882
White Plains, New York 10606
Tel.: (914) 437-8551
Fax: (888) 216-2220
dschwartz@saxenawhite.com
mduenas@saxenawhite.com

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci (*pro hac vice* forthcoming)
Robert N. Cappucci (*pro hac vice* forthcoming)
Jonathan H. Beemer (*pro hac vice* forthcoming)
Joshua K. Porter (*pro hac vice* forthcoming)
Jessica A. Margulis (*pro hac vice* forthcoming)
230 Park Avenue, 3rd Floor
New York, New York 10169
Tel.: (212) 894-7200
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
jbeemer@entwistle-law.com
jporter@entwistle-law.com
jmargulis@entwistle-law.com

– and –

Andrew J. Entwistle (*pro hac vice forthcoming*)
500 W. 2nd Street, Suite 1900
Austin, Texas 78701
Tel.: (512) 710-5960
aentwistle@entwistle-law.com

*Counsel for Plaintiff*